IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR GREEN CAPITAL,<br><br>      *Plaintiff*,<br><br> -against-<br><br>CITIBANK, N.A.; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY; *and* W.C. MCINTOSH, in his official capacity as ACTING DEPUTY ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>      *Defendants*. | Case No. 25-cv-00735-TSC<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |

HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
(646) 837-5151

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

INTRODUCTION .......................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 1

LEGAL STANDARD .................................................................................................................... 4

ARGUMENT .................................................................................................................................. 4

I.     CGC Is Likely to Succeed on the Merits of its Claims Against the EPA and Citi ............. 4

A.     The EPA's Pro Forma "Notice of Termination" Violates Federal Law ............................. 4

     i.     The Notice of Termination Violates EPA Regulations ...................................................... 4

     ii.     The Notice of Termination Lacks an Evidentiary Basis and Is Pretextual .................... 6

     iii.     The EPA Failed To Explain Its New Policy Position ...................................................... 7

     iv.     EPA's Tucker Act Defense Fails ................................................................................... 8

B.     CGC Is Likely to Succeed on the Merits of Its Claims Against Citi ................................. 9

II.     CGC Will Suffer Irreparable Harm Absent a Temporary Restraining Order ................... 13

III.     The Equities Favor CGC, and a TRO Is in the Public Interest ........................................ 15

CONCLUSION ............................................................................................................................. 16

## INTRODUCTION

Plaintiff Coalition for Green Capital ("CGC") moves for a limited temporary restraining order enjoining and prohibiting defendants from taking any steps to disburse any funds and financial assets in the "Accounts" at Citibank, N.A. subject to the Account Control Agreements ("ACA") of CGC and its Subgrantees except to the respective "Pledgor" identified in the respective ACAs.

CGC received a $5 billion grant pursuant to a lawful and duly enacted act of Congress and a final decision by the EPA. The EPA purported to "terminate" that grant agreement and seven others on March 11, 2025 in a baseless and pretextual attempt to dismantle a program authorized and funded by Congress that Administrator Zeldin does not like, in violation of the APA and applicable law. Meanwhile, Citi has refused to comply with the plain terms of the ACAs and has told CGC it will adhere to the Government's instructions, although that would be a plain breach of the ACAs.

Although CGC intends to move for broader provisional relief in the near future, it seeks only minimal provisional relief now—the maintenance of the Accounts at Citi, as they were when CGC filed this suit—to preserve the *status quo* and prevent any acts that could permanently prejudice CGC or this Court's ability to resolve the merits of CGC's challenge to EPA's supposed termination of its grant. Climate United moved for this and broader provisional relief, and CGC asked defendants if they would agree to abide by whatever ruling the Court issues in the *Climate United* case. Defendants declined to agree at this time, so CGC is compelled to seek that relief.

## STATEMENT OF FACTS

The broader context of this action is set forth in CGC's Complaint, *see* ECF 1 ("Compl."), ¶¶ 2–15, 25–42, and a related action pending before this Court, *Climate United Fund v. Citibank, N.A. et al.*, Case No. 25-cv-00698-TSC, in which this Court held a TRO hearing on March 12.

1

In short: CGC is the recipient of a $5 billion grant awarded by the EPA under its National Clean Investment Fund ("NCIF") program in April 2024, and obligated by the EPA in August 2024 pursuant to a grant agreement. Compl. ¶ 2. The NCIF is the product of a duly enacted congressional statute allocating funds to the EPA to make those grants on a competitive basis. *See* 42 U.S.C. § 7434. In accordance with its grant agreement, CGC entered into an ACA with Citi and the EPA, under which Citi serves as custodian of CGC's Accounts and the grant funds disbursed to CGC therein, and CGC has complete authority to instruct Citi as to the disposition of funds and financial assets in its Accounts, so long as they comply with certain conditions. Compl. ¶¶ 4–5, 7, 25–26. The ACA admits of only *one* exception to CGC's ability to instruct Citi regarding CGC's Accounts and funds—if the EPA issues a "Notice of Exclusive Control" to Citi. *Id.* ¶¶ 4, 27–29. A Notice of Exclusive Control, in turn, requires that the EPA simultaneously issue a written determination to CGC that it has found waste, fraud, material misrepresentation of eligibility status, or abuse, and has initiated a remedial action under the federal financial assistance regulations. *Id.* ¶ 29.

CGC's subgrantees also have ACAs at Citi. These require Citi to abide by the instructions of the subgrantees, subject only to the issuance of a Notice of Exclusive Control—but in that context the Notice of Exclusive control can be issued only by CGC, and *not the EPA*. *Id.* ¶¶ 35–38. Not one of the ACAs permits Citi to disburse funds to the Government, whether on issuance of a Notice of Exclusive Control or upon termination of the grants.

On March 11, 2025, the EPA transmitted a so-called "Notice of Termination" to CGC, and apparently issued identical notices to both other NCIF grantees with grant agreements with EPA.

*Id* ¶¶ 39–41; Compl. Exhibits A–B (ECF 6-1; 6-2).[1]  This "Notice of Termination" and the EPA's press statements omit any individualized determinations at all regarding termination of the NCIF grants agreements of CGC or any other grantee, and do not make any findings or identify any evidence regarding CGC's compliance with the terms of its grant agreement.  *See* ECF 6-1.  Instead, in the Notice and press release, EPA invoked "concerns regarding *program* integrity, the award *process*, *programmatic* fraud, waste, and abuse, and *misalignment* with the Agency's priorities," and EPA described "material deficiencies" relating to *EPA*'s own decision-making such as "improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities."  *Id.* (emphasis added).

Given that this Court held a TRO hearing in *Climate United*, CGC asked the Government and Citi whether they would agree not to disburse funds out of the ACAs to anyone other than a pledgor under those ACAs.  Alternatively, CGC asked whether, in the event the Court entered such restrictions in *Climate United*, the Government and Citi would agree to similar restrictions with respect to CGC.  The Government's response was that it was "not in a position to agree . . . at this time," although "[o]nce [the Government] receive[d] the Judge's guidance in her anticipated order on Climate United's TRO motion, we may then be in better position to have a productive conversation about your requests."  Ex. E.  In turn, Citi stated that "Citibank defers to, and will take direction from, the Government with respect to this request."  *Id.*

---

[1] Apparently, the EPA also purported to terminate its grant agreements with the five participants in the Clean Communities Investment Accelerator ("CCIA"), another program under the congressional Greenhouse Gas Reduction Fund.  *See* "Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants," EPA (Mar. 11, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-terminates-biden-harris-20b-gold-bar-grants.

3

**LEGAL STANDARD**

To warrant a temporary restraining order, "a movant 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest.'" *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)).

**ARGUMENT**

**I.    CGC Is Likely to Succeed on the Merits of its Claims Against the EPA and Citi[2]**

    **A.    The EPA's Pro Forma "Notice of Termination" Violates Federal Law**

        **i.   The Notice of Termination Violates EPA Regulations**

"[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)). EPA's stated basis for termination of the NCIF grant agreements—including references to program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the agency's priorities—are not lawful grounds for termination of these grant agreements under applicable statutes and regulations. *See* ECF 6-1.

Under bedrock administrative law, EPA's Notice of Termination must be evaluated against the rationale it invoked in the Notice. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[C]ourts may not accept . . . post hoc rationalizations for agency action."); *Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118, 1126 (D.C. Cir. 2024) ("bedrock

---

[2] CGC has advanced other claims, including against the EPA for a violation of the Due Process Clause, and against Citi for conversion and replevin, *see* Compl. ¶¶ 50–65, 75–86, and will develop those claims in future briefing.

4

principle of administrative law" that "agency action can be upheld only upon the validity of the grounds upon which the agency itself based its action" (alteration omitted)).

Here, EPA invoked only 2 C.F.R. § 200.340, which allows for termination of the grant agreement without a grantee's consent only according to the "terms and conditions of the Federal award" (*i.e.*, the grant agreement itself), *see id.* §§ 200.340(a)(1), (4). The terms and conditions in the NCIF grant agreements permit termination by EPA only on one of three bases: when (1) "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired," (2) "there is adequate evidence of Waste, Fraud, . . . or Abuse," or (3) there was a "material misrepresentation of eligibility status." Ex. D, NCIF Terms and Conditions at 36. The Notice of Termination does not rely on a single one of these grounds for termination, let alone substantiate them. The EPA does not point to any failure by CGC to comply with the Grant Agreement, nor a misrepresentation of eligibility status. *See* ECF 6-1.

Moreover, EPA regulations forbid withholding payments for allowable costs "unless required by Federal statute, regulations," or where the recipient "failed to comply with the terms and conditions of the Federal award" or "is delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). And before withholding funding, the agency must first "determine[] that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. To the extent the Notice of Termination purports to do so, it does so without a basis or according to proper procedure. *See* ECF 6-1 (stating that the grant agreement "cannot be remedied by imposing specific conditions" while simultaneously vowing to "re-obligate lawfully appropriated funds within the GGRF program with enhanced controls," *i.e.*, with specific conditions).

### ii. The Notice of Termination Lacks an Evidentiary Basis and Is Pretextual

Although the Notice of Termination generically refers to waste, fraud, and abuse, the EPA makes no finding of "Waste, Fraud, or Abuse," and it offers no evidence (and certainly not the "adequate evidence" required by the award) to substantiate one. *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (agency action is arbitrary and capricious when the agency "offer[s] an explanation for its decision that runs counter to the evidence before [it]" (quoting *State Farm*, 463 U.S. at 43)). There is none, and indeed, in the TRO hearing in *Climate United*, EPA's counsel admitted he was not aware of (and the EPA does not appear to possess) any such evidence.

Even if the EPA had made such a charge, it would clearly be pretextual. The agency terminated every NCIF grant agreement at once on March 11, 2025, apparently issuing identical notices to every grant recipient with a grant agreement within minutes of each other. Compl. ¶ 41. Moreover, the limited record presented by EPA in *Climate United* demonstrates the pretextual nature of EPA's stated invocation of waste, fraud, and abuse. On March 8, Acting Deputy Administrator McIntosh wrote on EPA's behalf that EPA had sent to each of the NCIF grant recipients with grant agreements on March 4 information requests, with a deadline of March 28, as part of what he said was "a compliance review of [the grant recipients'] organization, activities, and funds." *Climate United*, ECF 16-2 at 184. He further told Citi on March 8 that "[t]he purpose of the compliance review is to inform EPA of any further oversight issues or noncompliance as well as alert us to *potential* patterns of fraud, waste or abuse." *Id.* (emphasis added). The letter added that EPA had sent a letter to the Office of Inspector General regarding "concerns," and that there was then a "*lack* of *critical* information" as well as "*ongoing* investigations." *Id.* at 185

6

(emphasis added). Two days later, on March 10, EPA again alluded to "*concerns* regarding *potential* fraud and/or conflicts of interest." *Climate United*, ECF 14-2 at 2.

There is quite simply no reasonable explanation for Acting Deputy Administrator McIntosh to suddenly issue termination notices on March 11, the next day, to all three NCIF grant recipients (and all five CCIA grant recipients with grant agreements), 17 days before the March 28 deadline that EPA itself had set in its "compliance review," when EPA had just acknowledged a "lack of critical information." *Climate United*, ECF 16-2 at 185. The record thus demonstrates arbitrary and capricious agency action, and pretextual justifications.

### iii. The EPA Failed To Explain Its New Policy Position

As the Notice of Termination makes clear on its face, the EPA's termination was "based on substantial concerns regarding *program* integrity, the award process, *programmatic* fraud, waste, and abuse, and *misalignment with the Agency's priorities*." ECF 6-1. The Notice claims to rely on the EPA's "inherent authority to reconsider prior decisions." *Id.* It is thus patent that EPA's decision to terminate the program is based on a revised policy determination.

Although that is no ground to terminate the program or any of the NCIF grant agreements under applicable law, the rationale also fails on its own terms because EPA did not provide a sufficient explanation for its about-face, nor has it given consideration to factors such as the reliance interest of grant recipients. *See Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 537–58 (D.D.C. 2016) (explaining that "an agency [when] changing its course . . . is obligated to supply a reasoned analysis for the change" (citation omitted)); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156–57 (2012) (prohibiting agency from penalizing party for "good-faith reliance" on the agency's prior positions (citation omitted)). The Notice of Termination offers only unsubstantiated and conclusory statements; this is not enough. *United Steel v. Mine Safety &*

7

*Health Admin.*, 925 F.3d 1279, 1285 (D.C. Cir. 2019) (rejecting a "conclusory explanation"). For this reason too, CGC is likely to prevail.

### iv. EPA's Tucker Act Defense Fails

EPA's opposition to the TRO in *Climate United* sought to defend its actions primarily on the basis of a supposed lack of jurisdiction. This is no basis to deny preliminary relief.

To begin, it is settled that the Court has remedial authority to preserve the *status quo* and enter preliminary relief, even if there is a jurisdictional objection, so long as there is a substantial question that the Court has jurisdiction. Indeed, "[i]f a case presents a 'substantial' jurisdictional question, then under the All Writs Act, 28 U.S.C. § 1651, a district court may act to preserve its jurisdiction[.]" *Belbacha v. Bush*, 520 F.3d 452, 455–56 (D.C. Cir. 2008); *United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947) (district court "unquestionably ha[s] the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction"). There is plainly a substantial basis to find jurisdiction.

Regardless, CGC's claims are not subject to the exclusive jurisdiction of the Court of Federal Claims. CGC is not seeking damages in this action, and it does not matter that "after a court sets aside agency action, a natural consequence may be the release of funds held pursuant to that action." *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 752378, at *8 (D.D.C. Mar. 10, 2025). Nor do CGC's claims sound in contract. CGC's claims concern compliance with the U.S. Constitution, statutes, and regulations. And to the extent federal contracts have some relevance, the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley*

8

*Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.3d 959, 967–68 (D.C. Cir. 1982)).³ So the Court has jurisdiction.

      **B.**      **CGC Is Likely to Succeed on the Merits of Its Claims Against Citi**

CGC is likely to prevail on its contract claims against Citi. Citi has been in plain breach of the ACAs since February 18, 2025 because Citi has refused to comply with the instructions of CGC and its subgrantees directing the disposition of funds and financial assets in the Accounts. Moreover, if Citi were to send the funds of CGC and its Subgrantees back to the Government, it would be another patent breach of the ACA.

      **1.**  "To prevail on a claim for breach of contract under New York law, a plaintiff must show '(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.'" *Wiener v. AXA Equitable Life Ins. Co.*, 113 F.4th 201, 214 (2d Cir. 2024) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)). All four elements are met: The ACAs are valid and enforceable agreements, and CGC and its subgrantees performed all their obligations. Citi breached Section 2 of the ACAs by refusing to comply with the valid and lawful instructions of CGC and its subgrantees regarding the disposition of funds and financial assets in the Accounts, and any transfer of funds back to the government would plainly be a breach. And this conduct caused and will cause CGC and its subgrantees to suffer injury.

The terms of CGC's ACA with Citi are clear, and they require Citi to abide by CGC's instructions unless EPA issues a Notice of Exclusive Control. Section 1 of the ACA instructs that "[Citi] maintains the Accounts for [CGC], and all property (including, without limitation, all funds

---

³ CGC reserves the right to pursue any future relief in the Court of Federal Claims, but this has no impact on the Court's jurisdiction over this suit; the "critical point is that here Plaintiff[] assert[s] APA claims to invalidate agency policy directives, regardless of any breach of any agreement or the extent of any of their losses." *Aids Vaccine*, 2025 WL 752378, at *9; *see also Kidwell v. Dep't of Army, Bd. for Corr. of Military Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

9

and financial assets) held by [Citi] for the accounts of [CGC] are, and will continue to be, credited to the Accounts in accordance with instructions given by [CGC] (unless otherwise provided herein)." Ex. A ("ACA"), § 1.  Section 2 requires that "[Citi] *shall* comply *with all instructions, notifications, and entitlement orders [Citi] receives directing the disposition of funds and financial assets in the Account*s including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto . . . , originated by [CGC] . . . ." *Id.* § 2 (emphasis added).

The only exception to Citi's obligations to abide by CGC's instructions, as set forth in Section 2, occurs at "the time that [Citi] receives a notice . . . (a 'Notice of Exclusive Control') from [EPA] that [EPA] is exercising its right to exclusive control over an Account." *Id.*  Moreover, a Notice of Exclusive Control can only issue in certain circumstances, in accordance with federal law; in the Notice, the EPA must state in writing that it:

> has issued a written determination finding that [CGC] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that [the EPA] has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

ACA, Exhibit A.  And in accordance with the Terms and Conditions of the National Clean Investment Fund, the EPA is required to issue a copy of any Notice of Exclusive Control to both Citi and CGC, *and* to transmit the required written determination to CGC.  Ex. D, NCIF Terms and Conditions at 55.

For the reasons explained above, the EPA's purported "Notice of Termination" does not qualify as a Notice of Exclusive Control under CGC's ACA.  It was not a "written determination finding that [CGC] has failed to comply with the terms and conditions of the Grant Agreement,"

10

and, moreover, the EPA has not initiated any remedial action under 2 CFR 200.339. No party can argue, therefore, that the sole event justifying noncompliance with CGC's instructions took place.

For much the same reasons, Citi has also breached the ACAs governing CGC's Subgrantees' accounts. These ACAs are similar to CGC's, except that EPA does not get to issue a Notice of Exclusive Control. Under those ACAs, Citi must comply with the Subgrantee's instructions regarding the disposition of assets in their Accounts, unless *CGC* issues a Notice of Exclusive Control. This is consistent with the structure designed by the Government in awarding the grants.

Finally, none of these ACAs provide the Government the right to direct Citi to claw back the funds of CGC and its Subgrantees from their Accounts. Nor would termination authorize such disbursement: under Article 17 of the ACAs, upon termination of the ACAs, "the Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the *Pledgor*"—i.e., CGC or its Subgrantees, as the case may be, and not the Government. ACA, § 17. There is simply no basis to send funds of CGC and its Subgrantees to the Government. *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.").

**2.** In *Climate United*, Citi has not sought to justify its conduct based on the ACAs, but rather based on the Financial Agency Agreement ("FAA"), to which CGC is not a party. But Citi's obligations regarding the Accounts are set forth exclusively in the ACAs. Indeed, Section 9 of the ACAs specifically states that each ACA "constitutes the entire agreement between the parties and *sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts*." (emphasis added). "[W]here a contract contains a merger clause, a court is obliged to

11

require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 433 (2013).

Section 6(a) of CGC's ACA is in accord. It instructs that each of CGC *and the EPA* "acknowledges and agrees that (i) the duties, responsibilities, and obligations of the Bank shall be limited to those expressly set forth in this Agreement . . . , and no duties, responsibilities or obligations shall be inferred or implied." Again, had these "sophisticated . . . entities, represented by counsel" intended to condition Citi's obligations under the ACAs upon Treasury's rights under the FAA, "they easily could have included a provision to that effect." *Schron*, 20 N.Y.3d at 437.

Further, even if the FAA were relevant to interpretation of the ACAs, it would not preclude Citi from acting in accordance with the ACAs. The FAA provision that Citi principally invokes, *see Climate United* ECF 14, at 4, instructs Citi "to act only within the scope of its actual authority and to comply with all *lawful* instructions or directions received from Treasury," FAA § 5.B.iv (emphasis added). In contending that the FAA "required that Citibank comply with all lawful pause orders issued by EPA and the Department of Treasury," *Climate United* ECF 14, at 11, Citi ignores that Citi signed the ACA limiting its obligations with regard to the funds, and it would not be "lawful" to breach the ACA's control provision. Underscoring the point, the FAA itself specifies in Exhibit A who would have control over funds in the ACAs; Exhibit A makes very clear that CGC and the Subgrantees would have control, subject only to the issuance of a Notice of Exclusive Control which, in the case of CGC, could only be issued by EPA, and in the case of the Subgrantees, could only be issued by CGC. This was part of EPA's program design.

\*   \*   \*

In sum, Citi's continuing refusal to comply with the contractually valid instructions of CGC and its subgrantees regarding the disposition of funds and financial assets in CGC's Accounts are breach of the ACA—and Citi would further breach the ACAs if it were to act upon the threat of the federal Government to claw back funds from Accounts at Citi.

## II. CGC Will Suffer Irreparable Harm Absent a Temporary Restraining Order

If permitted, the EPA and Citi's attempt to seize and reallocate CGC's funds and financial assets will result in irreparable harm to CGC, including harm to its organizational mission and *unrecoverable* economic losses. CGC intends to move for a preliminary injunction at the soonest possible time to prevent this, and will provide evidence of specific and concrete injuries it will suffer in the absence of interim relief. At this juncture, however, CGC confines its motion for a temporary restraining order to those forms of irreparable harm which are clear as a matter of law.

*First*, if the funds are withdrawn from CGC's Account and re-allocated by the EPA, as the agency apparently plans to do, *see* ECF 6-1, the Court may be powerless to restore the *status quo ante* and grant CGC complete relief (at least, that is likely the Government's position). In cases involving government expenditure, "once the relevant funds have been obligated, a court cannot reach them in order to award relief." *City of Houston v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994). EPA's reallocation of funds may arguably deprive CGC of its ability to obtain complete relief, the loss of which is irreparable. *See Confed. Tribes of Chehalis Rsrv. v. Mnuchin*, 2020 WL 3791874, at \*2 (D.D.C. July 7, 2020) ("Plaintiffs would suffer irreparable harm if the court denied injunctive relief and the Secretary then distributed the . . . withheld . . . funds . . . . Such payments could result in this case becoming moot before receiving a full hearing . . . ."); *Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583, 588 (D.C.

13

Cir. 1977) ("[T]he equity powers of the courts allow them to take action to preserve the status quo of a dispute and to protect their ability to decide a case properly before them.").

*Second*, should the funds be clawed back from CGC's Account, CGC will be deprived of a statutory entitlement, which is an irreparable harm. *Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904, at *7 (D.D.C. 2024). Congress appropriated funds for the Greenhouse Gas Reduction Fund, 42 U.S.C. § 7434(a), to accomplish its statutory objectives—ultimately, the funding of projects that "reduce[] or avoid[] greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector," *id.* § 7434(c)(3)(A). "Congress enacted th[is] statute[] and appropriated these funds for legitimate reasons, and the Defendants' categorical freeze, untethered to any statute, regulation, or grant term, frustrates those reasons . . . ." *New York v. Trump*, 2025 WL 715621, at 14–15 (D.R.I. Mar. 6, 2025). CGC is an "eligible recipient" within the meaning of 42 U.S.C. § 7434(c)(1), and was awarded the grant by EPA and entered into a binding grant agreement with EPA. The unlawful revocation of the funds at this stage thus constitutes irreparable harm that warrants the issuance of a TRO. *See, e.g.*, *Endo Par Innovation*, 2024 WL 2988904, at *7 ("This Court has also recognized that a clear statutory entitlement is not 'merely economic' harm, and its loss may be sufficiently irreparable to justify emergency economic injunctive relief because once the statutory entitlement has been lost, it cannot be recaptured." (cleaned up) (quoting *Hi-Tech Pharmacal Co., Inc. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008)).

*Last*, Citi is largely insulated by the ACA, which does not allow damages "for indirect, incidental, consequential, punitive or special losses or damages." ACA, § 6(b); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 289–90 (D.D.C. 2018) (looking to contract terms to identify unrecoverable economic losses). In these circumstances, even economic losses constitute

irreparable harm warranting an injunction. *Endo Par Innovation*, 2024 WL 2988904, at *7 (economic harm irreparable because it was "unrecoverable from any other party" given government defendant's sovereign immunity and plaintiff's inability to recover from private defendant).

### III. The Equities Favor CGC, and a TRO Is in the Public Interest

The equities favor the movant when "a preliminary injunction will 'not substantially injure other interested parties.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). With respect to the EPA, the balance of the equities and the public interest "merge" because "the government is the defendant." *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 176 (D.D.C. 2021).

Preventing the EPA from clawing back funds in CGC's Account pursuant to its purported "Notice of Termination" is warranted because, as explained above, the Notice is plainly contrary to law, and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 176 (D.D.C. 2021) (quoting *League of Women Voters*, 838 F.3d at 12); *N. Mariana Islands v. United States*, 686 F. Supp 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Indeed, CGC's "suit itself is brought in the public interest" because it seeks to require the EPA to "follow the regulations which control government contracting." *Scanwell Lab'ys, Inc. v. Shaffer*, 424 F.2d 859. 864 (D.C. Cir. 1970); *Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 745 (S.D. Tex. 2024) (public interest served by injunction preventing action "that conflicts with the plain language of an appropriations bill").

As to Citi, there is a clear public interest in "enforcing valid contractual provisions." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34–35 (D.D.C. 2002).

And the equities favor an injunction preventing revocation of the funds in CGC's Account; in its briefing and statements in connection with the *Climate United* case, Citi repeatedly emphasized its "desire[]" only to "fulfill its contractual obligations" and its willingness to "follow any court order." *Climate United*, *supra*, ECF 14, at 4, 8, 14. In correspondence with undersigned counsel in an effort to seek a stipulated consent order that would obviate the necessity for this motion, Citi stated it "defers to, and will take direction from, the Government." Ex. E. A TRO that requires Citi to preserve the status quo, consistent with lawful statutes, cannot harm Citi or the public.

Moreover, equitable relief would impose a minimal burden on defendants, if any, because "any injunction would be for a very short duration and would merely maintain the status quo until the Court has an opportunity to consider the merits of the case." *Ace-Fed. Reps., Inc. v. FERC*, 732 F. Supp. 10, 13 (D.D.C. 1990). Given the possibility that revocation of grant funds could permanently deprive CGC of its ability to fully accomplish its (and Congress's) mission, a TRO is warranted.

## CONCLUSION

Pending CGC's upcoming motion for a preliminary injunction, and while the Court considers that motion, the EPA should be enjoined from ordering, and Citibank from carrying out, any action to claw back funds held by Citi in the Accounts of CGC and its Subgrantees.

DATED:   March 14, 2025
         New York, New York

>                        HOLWELL SHUSTER & GOLDBERG LLP
>
>
>                        By:   */s/ Vincent Levy*
>                        Vincent Levy (NY0487)
>                        Kevin D. Benish (NY0495)
>                        Patrick J. Woods (*Admission Application Forthcoming*)
>                        Daniel Fahrenthold (NY0603)
>                        425 Lexington Avenue, 14th Floor
>                        New York, NY 10017

(646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiff*